2017-1487

# United States Court of Appeals for the Federal Circuit

## ALTAIRE PHARMACEUTICALS, INC.,

*Appellant,*

v.

## PARAGON BIOTECK, INC.,

*Appellee.*

APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE, PATENT TRIAL AND APPEAL BOARD IN NO. PGR2015-00011

## ALTAIRE'S OPPOSITION TO PARAGON'S MOTION TO DISMISS

Craig E. Countryman
Oliver J. Richards
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130
(858) 678-5070
countryman@fr.com
richards@fr.com

February 24, 2017

## CERTIFICATE OF INTEREST

Counsel for Altaire Pharmaceuticals, Inc. certifies the following.

1.     The full name of every party represented by me: Altaire Pharmaceuticals, Inc.

2.     The name of the real party in interest represented by me: Altaire Pharmaceuticals, Inc.

3.     Parent corporations and publicly held companies that own 10% or more of stock in the party: None.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court (and who have not or will not enter an appearance in this case):

Blank Rome LLP: Charles W. Saber, Dipu A. Doshi, Mark J. Thronson, Jonathan W. S. England; Dickstein Shapiro LLP: Edward Meilman;

Fish & Richardson P.C.: Craig E. Countryman, Oliver J. Richards

February 24, 2017

s/ *Craig E. Countryman*
Craig E. Countryman

i

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................1

STATEMENT OF FACTS .....................................................................................2

ARGUMENT ...........................................................................................................7

I.      Altaire Has Standing to Appeal Because Altaire Is Harmed By Paragon's Invalid Patent ...........................................................................................................7

    A.      The Real and Imminent Threat of a Patent Infringement Suit Gives Rise to Article III Standing .......................................................................................8

    B.      Altaire's Concrete Reputational Injury is Sufficient to Confer Article III Standing ..............................................................................................................15

    C.      Paragon's Cited Cases Are Inapposite and Did Not Address Either of the Harms at Issue Here. .......................................................................................19

CONCLUSION ......................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3M Co. v. Chemque, Inc.*,
　303 F.3d 1294 (Fed. Cir. 2002) ............................................................. 10

*ABB Inc. v. Cooper Indus., LLC*,
　635 F.3d 1345 (Fed. Cir. 2011) ............................................................... 9

*Arkema Inc. v. Honeywell Int'l, Inc.*,
　706 F.3d 1351 (Fed. Cir. 2013) .......................................................... 9, 11

*Astrazeneca LP v. Apotex, Inc.*,
　633 F.3d 1042 (Fed. Cir. 2010) ............................................................. 10

*Consumer Watchdog v. Alumni Research Foundation*,
　753 F.3d 1258 (Fed. Cir. 2014) ........................................................ 19, 20

*eBay Inc. v. MercExchange, LLC*,
　547 U.S. 388 (2006) .............................................................................. 14

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
　136 S. Ct. 1923 (2016) ........................................................................... 14

*Lang v. Pacific Marine and Supply Co., Ltd.*,
　895 F.2d 761 (Fed. Cir. 1990) .............................................................. 14

*MedImmune, Inc. v. Genentech, Inc.*,
　549 U.S. 118 (2007) ............................................................................. 8, 9

*New Hampshire v. Maine*,
　532 U.S. 742 (2001) .............................................................................. 12

*PPG Industries, Inc. v. Valspar Sourcing, Inc.*,
　No. 2016-1406, 2017 WL 526116 (Fed. Cir. Feb. 9, 2017) ................. 9, 11

*Phigenix, Inc. v. Immunogen, Inc.*,
　845 F.3d 1168 (Fed. Cir. 2017) ........................................................ 19, 20

*Prasco, LLC v. Medicis Pharm. Corp.*,
　537 F.3d 1329 (Fed. Cir. 2009) ............................................................... 8

*Shukh v. Seagate Tech., LLC,*
    803 F.3d 659 (Fed. Cir. 2015) .............................................................15, 16, 17

*USV Pharmaceutical Corp. v. Weinberger,*
    412 U.S. 655 (1973) ...........................................................................................3

**Statutes**

35 U.S.C. § 271(e)(2) .............................................................................8, 10, 11, 14

35 U.S.C. § 283 ...............................................................................................................14

35 U.S.C. § 284 ...............................................................................................................14

35 U.S.C. § 325(e)(2) ..................................................................................................11

Public Law No. 87-781, § 107(c)(4), 76 Stat. 788 ...............................................3

**Other Authorities**

Fed. Cir. R. 27(d) ........................................................................................................23

Fed. R. App. P. 27(d) ................................................................................................23

Fed. R. App. P. 27(d)(2)(A) ....................................................................................23

Fed. R. App. P. 32(a)(5) ...........................................................................................23

Fed. R. App. P. 32(a)(6) ...........................................................................................23

Oliver Wendell Holmes, *The Path of the Law*, 10 Harv. L. Rev. 457, 462
    (1897) ................................................................................................................................13

RESTATEMENT (SECOND) OF CONTRACTS Ch. 16 Intro. Note (1981) ...........................13

# INTRODUCTION

This appeal arises from a post-grant review brought by Altaire, a creator and manufacturer of a finished drug product (Phenylephrine HCl Ophthalmic Solution), against a patent owned by the drug's exclusive distributor, Paragon. Altaire had been manufacturing and selling phenylephrine for some 11 years on its own, but, after the FDA began encouraging companies to obtain approval for their formulations, Altaire contracted with Paragon to pursue a new drug application from the FDA for its phenylephrine product. Altaire provided the chemistry and control information (including its confidential formulation for the finished drug product), and Paragon secured FDA approval with Altaire as its exclusive manufacturer until 2021. But Paragon went further—it also applied for a patent disclosing Altaire's confidential formulation in breach of the parties' agreement and claiming methods Altaire developed and disclosed pursuant to the agreement.

Altaire has Article III standing to proceed with this appeal because Paragon's patent inflicts harms on Altaire that were not at issue in any of the cases cited in Paragon's motion. Altaire faces an imminent threat of suit on the patent. Paragon is currently trying to terminate the parties' agreement in a contact suit, and, if that succeeds, then Altaire would be subject to a patent infringement suit for continuing to make and sell its own drug, as it had been doing for some 11 years before the parties' agreement. Moreover, the patent inflicts reputational injury on Altaire, because it erroneously asserts that Paragon, not Altaire, is the true inventor of Altaire's

1

formulation.  Altaire has standing because a favorable decision in this appeal would redress both of these injuries.

## STATEMENT OF FACTS

The drug at issue here is a solution of eye drops for dilating a patient's pupils—for example, when going to the eye doctor for an exam.  The active ingredient is phenylephrine hydrochloride, a selective α1-adrenergic receptor agonist, and it is administered in an aqueous (water-based) buffered solution with various other ingredients.  *See* Ex. 13, at 2.  As with many other molecules, phenylephrine exists in two different forms that include the same atoms but in different spatial arrangements.  Each different form, known as an "optical isomer" or "enantiomer," has a particular orientation (either the (R) form or the (S) form) such that they are non-superimposable mirror images.  *See id.*  Only one enantiomer of phenylephrine—R-phenylephrine hydrochloride—causes pupil dilation.  *See id.*  As such, manufacturers of phenylephrine finished drug products use only R-form phenylephrine when manufacturing their finished products.  *See id.*  The "chiral purity" of phenylephrine drug substance is the relative amount of the R-form compared to the S-form.

Altaire, a family-owned pharmaceutical company, began manufacturing phenylephrine in 2000 for itself and for various distributors under private labels.  Ex. 1, ¶¶ 2, 5; *see also* Ex. 14, at 6.  Altaire's phenylephrine drug product has consistently been packaged with labeling instructing storage in a refrigerator "at 2°–8° C (36°–46° F)" to avoid an otherwise harmless discoloration of the solution unrelated to chirality:

2



Ex. 1, ¶ 6-8; Ex. 6, at 1-2; *see also* Exs. 3 & 4 (shown as annotated). Altaire's products

all had a chiral purity of over 95% of the R-form of phenylephrine when stored for

over 6 months at the refrigeration conditions on the label. Ex. 6, at 7; Ex. 7.

When Altaire first began selling its phenylephrine drug products, it did not

need FDA approval, because Phenylephrine HCl Ophthalmic Solution was an

unapproved drug that was used to dilate eyes for over 70 years—making it a

'grandfathered' drug product exempt from the requirement of FDA approval. *See*

Public Law No. 87-781, § 107(c)(4), 76 Stat. 788*; USV Pharmaceutical Corp. v.*

*Weinberger*, 412 U.S. 655, 662-66 (1973). However, the FDA introduced an

Unapproved Drug Product Initiative to encourage the industry to seek marketing

approvals for then unapproved drugs while minimizing market disruption, and, by

2011, Altaire concluded it would be advantageous to obtain FDA approval for its

3

formulation.  *See* Ex. 1, ¶ 9.  Altaire entered into an agreement with Paragon in May 2011 to work together to file New Drug Applications with the FDA for the phenylephrine drug product and one other ophthalmic product.  *See* Ex. 8.

The parties' agreement called for Altaire to draw on its years of experience producing phenylephrine to provide the Chemistry, Manufacturing, and Control (CMC) sections of the New Drug Application and to manufacture and supply the drug to Paragon.  *Id.* at 2.  Paragon would then market and distribute the phenylephrine drug product developed and produced by Altaire.  *Id.*  Altaire provided the CMC section as promised, and the FDA approved the application on March 21, 2013.  Ex. 1, ¶ 11.  The parties' agreement expires in May 2021, and, in the interim, Altaire has been manufacturing its proprietary phenylephrine product exclusively for Paragon pursuant to the May 2011 agreement.

The parties' dispute has arisen based on what Paragon has done with the proprietary and confidential CMC information Altaire provided under the agreement. The parties' agreement prohibits Paragon from publicly disclosing any and all "writing, documents, data and/or information" developed by Altaire in pursuit of the new drug application.  Ex. 8, at 3.  The agreement also restricts Paragon to using Altaire's confidential information "for the limited purposes of obtaining NDA approvals," prohibits its use "for any other purpose" without Altaire's consent, and specifies that the disclosure of the CMC information does not grant Paragon any

4

rights to or license in Altaire's confidential information and they do not have the

"right to publish or otherwise make commercial use" of the Altaire information. *Id.*

Recognizing those restrictions, Paragon's lawyers contacted Altaire in June

2013 and sought to amend the agreement "to address the new patent application

filing" by Paragon that eventually became the '623 patent. Ex. 1 ¶ 9; Ex. 9. Altaire

replied that it would not consent, because "any such patent application should identify

either Al Sawaya [Altaire's CEO] or Altaire as the sole inventor" and that "the

formulation, processes and controls applicable to the Phenylephrine product were

developed solely by Al Sawaya and Altaire" and were confidential under the

agreement. *Id.* Paragon ignored these points and, without securing Altaire's consent,

Paragon applied a patent in November 2013. Ex. 2. The application listed only

Paragon employees as inventors, even though the specification's sole disclosed

formulation (Example 1) is the same confidential and proprietary formulation of

Altaire's phenylephrine drug products that Altaire sold for years before partnering

with Paragon, disclosed to Paragon pursuant to the May 2011 agreement. *See id.*

Paragon's application issued as U.S. Patent No. 8,859,623 in October 2014, and

it does not expire until June 2033. The claims cover treatment methods that are met

by administering Altaire's prior phenylephrine product (and the parties' current

product) to a patient, as shown by representative claim 1 below:

> 1. A method of using an ophthalmic composition for pupil dilation, the
> composition comprising R-phenylephrine hydrochloride having an initial
> chiral purity of at least 95% and an aqueous buffer, wherein the chiral purity

of R-phenylephrine hydrochloride is at least 95% of the initial chiral purity
after 6 months, the method comprising:

> administering the composition into an eye of an individual in need
> thereof, wherein the composition is stored between −10 to 10 degree
> Celsius prior to administration, and wherein the composition
> comprises R-phenylephrine hydrochloride having a chiral purity of at
> least 95% when administered after storage.

Ex. 2, '623 patent at 12:39-50.

The patent's specification erroneously attempts to link refrigeration to
maintaining chiral purity, but maintaining the R-form phenylephrine in a properly
manufactured phenylephrine finished drug product (manufactured only with R-form
drug substance) does not require storage under refrigerated (2°C - 8°C) conditions.
*See* Ex. 1 ¶¶ 6-8. The R-form drug product will not convert to S-form if stored under
room temperature conditions (20°C - 25°C), as shown by test data submitted by
Altaire in this post-grant review. *See* Ex. 6, at 10-17; *see also generally* Exs. 5 & 10.

Altaire filed a post-grant review petition in May 2015 challenging the '623
patent. Altaire sought review for at least two reasons. First, Altaire wanted to correct
the record as to who created and developed the technology claimed in the patent. Ex.
1 ¶ 14. Second, Altaire wanted to cancel claims that would threaten its ability to
continue producing its proprietary phenylephrine drug product in the event that the
agreement between Paragon and Altaire terminates. Ex. 1 ¶ 22. Altaire has strong
reason to fear that the contract will terminate. The parties have filed state law claims
against one another in the Eastern District of New York, with Paragon alleging that

"Altaire has materially breached the Agreement" and alleging that "Altaire's material breaches under the Agreement entitle Paragon to terminate the Agreement." Ex. 12 ¶¶ 74, 76. Paragon's claims parrot its allegations in an earlier suit it filed in the District of Oregon, which was dismissed on jurisdictional grounds. *See* Ex. 1 ¶ 17; Ex. 11. Moreover, the contract will expire in May 2021, even if Paragon is not successful in ending the contract early. *See* Ex. 8, at 1. When the contract ends, Altaire cannot resume selling its prior phenylephrine product without immediate threat of a patent infringement suit on the '623 patent.

The Patent Office instituted Altaire's post-grant review but subsequently found Altaire had not demonstrated unpatentability based on various procedural quibbles with Altaire's evidence about its prior product. *See generally* Ex. 13. Altaire now appeals that decision to prevent Paragon from using the '623 patent—claiming Altaire's own invention—to block Altaire from selling the same product it had previously, either starting in May 2021 when the contract expires or much sooner, if Paragon prevails in the EDNY action and terminates the contract. Altaire also appeals to vindicate its reputational interest in being recognized as the true inventor.

## ARGUMENT

### I.    Altaire Has Standing to Appeal Because Altaire Is Harmed By Paragon's Invalid Patent

"To satisfy standing, the plaintiff must allege (1) an injury-in-fact, *i.e.*, a harm that is concrete and actual or imminent, not conjectural or hypothetical, (2) that is

fairly traceable to the defendant's conduct, and (3) redressable by a favorable decision." *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1338 (Fed. Cir. 2009). Altaire meets these elements, because it faces an imminent risk of suit on the '623 patent and it is suffering a concrete reputational injury based on Paragon's misappropriation of Altaire's invention. Both harms are attributable to Paragon, and this appeal would redress both by removing the '623 patent as an impediment to Altaire being able to sell its own product and by restoring Altaire's reputation as the true innovator. We discuss each point further below, and then explain why Paragon's cited cases do not preclude standing here.

### A.     The Real and Imminent Threat of a Patent Infringement Suit Gives Rise to Article III Standing

Altaire faces a real and imminent threat that Paragon will sue it for infringement of the '623 patent. Paragon is seeking to immediately terminate the parties' agreement in the Eastern District of New York litigation. If that succeeds, Altaire will seek FDA approval to continue to sell its phenylephrine product on its own, risking an infringement suit by Paragon under 35 U.S.C. § 271(e)(2). That suffices to establish Altaire's Article III standing to maintain this appeal.

A party has Article III standing to challenge the validity of a patent when the party, "under all the circumstances, show[s] that there is a substantial controversy between the parties having adverse legal interests, of sufficient immediacy and reality." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (finding that a patent

8

licensee was not required to expose itself to liability by breaking the license agreement to Article III standing to challenge the patent's validity).  Article III does not require as a prerequisite to testing the validity of a patent "that the plaintiff bet the farm, so to speak, by taking the violative action." *Id.*  Nor does Article III require a "specific threat of infringement litigation by the patentee . . . to establish jurisdiction." *ABB Inc. v. Cooper Indus., LLC*, 635 F.3d 1345, 1348 (Fed. Cir. 2011); *see also Arkema Inc. v. Honeywell Int'l, Inc.*, 706 F.3d 1351, 1357–59 (Fed. Cir. 2013) (finding that a party had standing to challenge the validity of patent even though no infringing acts had been undertaken and no specific threat of infringement had been made).  Rather, a party has Article III standing if it has "concrete plans" to pursue activity that it reasonably believes the patentee would consider to be infringing.  *See Arkema* at 1357; *see also PPG Industries, Inc. v. Valspar Sourcing, Inc.*, No. 2016-1406, 2017 WL 526116, at *1 (Fed. Cir. Feb. 9, 2017) (non-precedential) (finding that a party had standing to appeal from adverse *inter partes* reexamination because the petitioner "had a legitimate concern that its manufacture and sale of [potentially infringing products] would draw an infringement action by" the patent owner).

Altaire readily meets this standard.  Altaire had been producing its phenylephrine drug product for over a decade before its agreement with Paragon.  As discussed above, Altaire's previous products were labeled for storage within the temperature range claimed by the '623 patent, and they both started with and maintained the claimed chiral purity.  *See* Ex. 14, at 35–37.  Altaire continues to

manufacture those same products today for Paragon, and Altaire intends to continue production of its composition of phenylephrine whether or not Paragon is successful in terminating its contract with Altaire. Ex. 1 ¶¶ 16, 18. Specifically, Altaire intends to pursue an Abbreviated New Drug Application (ANDA) using the same instructions regarding refrigerated storage that it has used for years. *Id.* ¶¶ 19-21.

Altaire has good reason to believe that Paragon would consider such activities to be infringing. Filing an ANDA on a product whose use is covered by a patent is an act of infringement. *See* 35 U.S.C. § 271(e)(2). A drug manufacturer who instructs physicians to administer a drug in a manner claimed by a method-of-administration claim may be liable for inducing infringement of a patent. *See 3M Co. v. Chemque, Inc.*, 303 F.3d 1294, 1305 (Fed. Cir. 2002) (defendant who is aware of a patent and supplies a product to a customer with instructions for use, which when followed lead to infringement, has encouraged acts constituting direct infringement); *Astrazeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1060 (Fed. Cir. 2010) ("The pertinent question is whether the proposed label instructs users to perform the patented method. If so, the proposed label may provide evidence of Apotex's affirmative intent to induce infringement."). Such an infringement suit is not a remote possibility—Paragon is seeking immediate termination of the parties' contract in the district court case, which is in an advanced stage of litigation. Summary judgment motions are due at the end of March 2017. *See* Ex. 1, ¶ 16. A joint pre-trial order is due in early May 2017, and trial is expected in Summer 2017. *See id.*

Further, at a minimum, the current contract expires in May 2021. Given Paragon's current attempts to terminate the contract, it appears unlikely that Paragon will agree to renew it beyond May 2021. *See* Ex. ¶ 18. As a result, Altaire will need to file an ANDA well before May 2021 to ensure that it actually obtained FDA approval to begin selling its own version of the drug in May 2021. Ex. 1 ¶ 19. That filing would likely trigger a suit by Paragon under § 271(e)(2) on a patent that does not expire until June 2033. That makes this a quintessential example of a case where a party who reasonably apprehends a patent-infringement suit has standing to challenge the validity of a patent. *See Arkema*, 706 F.3d at 1357; *PPG*, 2017 WL 526116, at *1.

Altaire's injury is compounded by the fact that the potential estoppel effect that the Patent Office's decision here will have in future patent infringement litigation. The Patent Act prohibits a "petitioner in a post-grant review" from "assert[ing] either in a civil action . . . . that the claim is invalid on any ground that the petitioner raised or reasonably could have raised during that post-grant review." 35 U.S.C. § 325(e)(2). Thus, if Altaire is unable to seek correction of the PTO's erroneous decision in this appeal, estoppel will hinder its ability to defend itself against claims of patent infringement by Paragon—again, based on a patent covering technology that Paragon stole from Altaire. *See PPG*, 2017 WL 526116, at *2 (noting that a party's "stake" in an inter partes reexamination is "enhanced by the estoppel provisions contained within the inter partes reexamination statute"). Altaire will suffer that harm today, because this is its one and only chance to appeal the Patent Office's decision here,

even if the infringement litigation did not begin until the parties' contract expired in May 2021. That makes this case far different from one where estoppel isn't in play.

Paragon argues (at 10) that Altaire cannot allege possible injury resulting from an infringement suit because "irrespective of the '623 patent, [the contract] prohibits Altaire from manufacturing and selling ophthalmic phenylephrine solutions to parties other than Paragon until 2021." That is wrong for multiple reasons.

First, Paragon ignores the fact that it has sought to immediately terminate the contract. Paragon cannot be heard to argue that the contract should be immediately terminated in the New York case but argue to this Court that the contract will definitely run through May 2021. Paragon's own conduct is seeking to terminate the contract before its expiration date makes the prospect of patent infringement litigation real and immediate. Indeed, if Paragon got what it was seeking in the New York case, then Altaire would immediately lose all rights to manufacture its proprietary phenylephrine product under the agreement and face an immediate infringement suit if it filed an ANDA seeking approval to sell the same product it previously sold on its own for over a decade. Paragon thus cannot argue here that patent infringement litigation will not happen before May 2021. *Cf. New Hampshire v. Maine*, 532 U.S. 742, 749, 751 (2001) (explaining that "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary

position," especially when "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party.").

Second, Paragon also ignores the fact that that Paragon's invalid patent gives Paragon an unfair advantage in continuing negotiations over the parties' relationship, such as what the terms would be for any renewal of the contract past May 2021. Paragon's patent forces Altaire to negotiate from a position of weakness because the patent prevents Altaire from being able to continue manufacturing its proprietary phenylephrine product for itself or anyone else. *See* Ex. 1 ¶ 23. In essence, the patent forces Altaire to accept whatever terms are forced upon it by Paragon or give up a business that it has had for over a decade. That inflicts serious economic injury on Altaire.

Third, Paragon overlooks the fact that its patent would allow it to seek remedies against Altaire that are not available in contract law. Paragon cannot use the contract to obtain an injunction forbidding Altaire from manufacturing or selling its own phenylephrine product for others. That rule has been settled for over a century. *See, e.g.,* Oliver Wendell Holmes, *The Path of the Law*, 10 Harv. L. Rev. 457, 462 (1897) ("The duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it,—and nothing else."). What's more, "punitive damages have not been awarded for breach of contract." RESTATEMENT (SECOND) OF CONTRACTS Ch. 16 Intro. Note (1981). Patent law, by contrast, does permit Paragon to seek both an injunction preventing Altaire from manufacturing and selling its

13

phenylephrine product, either under its own name or with someone else. *See* 35 U.S.C. § 283; *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006). And, unlike contract law, patent law does provide for punitive damages in the event of willful infringement. *See* 35 U.S.C. § 284; *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932 (2016). So Paragon's patent is a barrier that imposes additional obstacles well above the parties' contract.

Fourth, even if the contract remains in place until May 2021, Altaire would still need to file an ANDA well before May 2021 to ensure that it actually obtained FDA approval to begin selling its own version of the drug in May 2021. Ex. 1 ¶ 19. Paragon is thus wrong to imply that there no risk of an infringement suit before May 2021 if the contract remains in place. Altaire's filing of the ANDA would subject it to suit under § 271(e)(2), regardless of whether it actually begins manufacturing or selling its own product before May 2021. Paragon's reliance on *Lang v. Pacific Marine and Supply Co., Ltd.*, 895 F.2d 761 (Fed. Cir. 1990) is therefore misplaced, because there is no reason to assume that there will be no patent litigation until 2021, and because that dealt with whether a patentee had Article III standing to seek a declaration of future infringement, not whether a potential defendant had Article III standing to challenge a decision that would estop it in future litigation.

The bottom line is that the threat of a patent infringement suit presents a real, imminent, and substantial threat of injury to Altaire. That threat would be

ameliorated by a favorable ruling from this Court. Accordingly, Altaire has standing to bring this appeal.

### B. Altaire's Concrete Reputational Injury is Sufficient to Confer Article III Standing

Altaire independently suffers reputational harm sufficient to confer Article III standing from Paragon's invalid patent, because the patent improperly credits Paragon, not Altaire, with the discovery of the disclosed and claimed invention. *Shukh v. Seagate Tech., LLC*, 803 F.3d 659 (Fed. Cir. 2015). In *Shukh*, this Court held an allegedly omitted inventor had standing to seek correct inventorship under § 256 based on a "concrete and particularized reputational injury," even though doing this wouldn't have given him an independent ownership interest in the patent. *Id.* at 663. The Court explained that "being considered an inventor of important subject matter is a mark of success in one's field, comparable to being an author of an important scientific paper," and that "[p]ecuniary consequences may well flow from being designated as an inventor" such as better opportunities for employment and advancement. *Id.*

This case is just like *Shukh*. Altaire is seeking to vindicate its reputational interest in being recognized as the true inventor of the claimed treatment method. Paragon's patent is harming Altaire's reputation, because it makes it seem as if Paragon, not Altaire, created the phenylephrine formulation whose use is covered by the claims. *See* Ex. 1 ¶¶ 4, 14-15. That harm is particularly acute because Altaire is

part of a highly competitive industry, and, as a result, Altaire is likely to suffer harm in the marketplace from its diminished reputation. *See id.* Paragon has sought to maximize that harm by issuing a press release about this very case, calling the Board's decision a "monumental ruling" that "affirm[s] claims **made by Paragon** in the patent for *its* R-phenylephrine hydrochloride formulation" and that determines Altaire's petition was "without merit." Ex. 16. Paragon's description of the Board's decision is incorrect, because the Board denied Altaire's petition on procedural grounds, not the merits. More importantly, though, Paragon is using the Board's decision to tout its own reputation and diminish Altaire's—inaccurately saying that the patent is for Paragon's own formulation, when Altaire's appeal here will show that Altaire is the true inventor of these claims. *Id.* This appeal would redress that injury, which will likely have real economic consequences and harm Altaire in the marketplace. Ex. 1 ¶ 15. Indeed, Paragon would have no reason to issue its press release unless these reputational concerns were important in the market.

*Shukh* recognized that an innovator like Altaire suffers inherent reputational harm when someone else claims his or her invention as their own. Here, Paragon represented to the world that it invented the subject matter of the '623 patent when it pursued and received a patent. But Altaire, not Paragon, developed the phenylephrine formulation disclosed in the '623 Patent, developed the test data relied on by Paragon, and provided the instructions to store the phenylephrine in a refrigerator. Ex. 1 ¶ 10-11. Use of Altaire's formulation is covered by the '623 claims. Yet the '623 patent

16

does not list any inventors from Altaire nor does it even mention Altaire anywhere in the specification.  Altaire thus suffers the same type of harm that *Shukh* found sufficient to provide Article III standing.

It was exactly this harm that Altaire's CEO identified when questioned in his deposition:

> Q.   How do the shareholders of Altaire Pharmaceuticals stand to benefit from the patent at issue in this proceeding being deemed unpatentable?
>
> A.   It would return and restore the science of phenylephrine ***to where it belongs*** without any fantasy.

Ex. 15, at 16:7–15.  In other words, Altaire's CEO was concerned that Paragon had inappropriately claimed as its own the science of phenylephrine and sought post-grant review to return that science "***to where it belongs***"—Altaire.  Likewise, Altaire's CEO made clear later on in the deposition that Altaire suffered reputational harm resulting from Paragon's misappropriation of its intellectual property:

> Q.   What financial benefit would Altaire Pharmaceuticals receive from the cancellation of the '623 patent?
>
> A.   It would set the science straight.
>
> Q.   Is –
>
> A.   Hold on.  I have to give a whole answer to your question.  It would set the science straight.  So there is not in the system, a default.  And I can explain that later on if you want.
>
>   ***And the other benefit that Altaire would get is the ability to control its own intellectual property, which is – so by doing the design of the patent which had taken Altaire's intellectual property in the***

17

> ***public domain and created hardship and cost, and so devalued our
> intellection property and it's cause[d] harm.***

*See id.* at 62:7–24.

Paragon incorrectly asserts (at 9-10) that the disclosed formulation of
phenylephrine is the only Altaire intellectual property in the '623 patent. But Paragon
confuses its improper disclosure of Altaire's confidential formulation with Paragon's
improper attempt to claim Altaire's idea of using a refrigerated, chirally pure R-
phenylephrine formulation as Paragon's own. Although the storage method may have
been in the public domain because the label was distributed publicly, it was
nonetheless conceived entirely by Altaire, not Paragon. And, of course, Altaire's
position in this post-grant review is that use of its formulation practiced and predated
all the claims, rendering them invalid.

Paragon additionally argues (at 10) that "to the extent Altaire alleges an injury
in fact relating to disclosure of the formulation, it is not one that could be remedied in
a post-grant review because cancellation of the claims does not expunge the
disclosure from the public domain." This misses the point. Cancellation of the
patent can and will remedy Altaire's reputational harm by invalidating Paragon's
improper claim to have invented the subject matter of the '623 patent. A finding by
this Court that Altaire's previous discovery and use of the patented method predates
and invalidates Paragon's patent would restore Altaire as the true inventor and put the
lie to Paragon's inaccurate statements to the marketplace in its press release. That

Altaire is also seeking damages in district court for Paragon's breach of the non-disclosure agreement does not diminish Altaire's reputational interest in making clear who was the first to invent the claimed subject matter.

In short, Altaire suffers reputation harm as a result of Paragon's improper claim to have invented the subject matter of the '623 patent. This Court can remedy that harm by cancelling Paragon's claims. Thus Altaire has standing to challenge the patent on appeal.

### C. Paragon's Cited Cases Are Inapposite and Did Not Address Either of the Harms at Issue Here.

Paragon largely bases its motion (*e.g.*, at 1) on two cases—*Phigenix, Inc. v. Immunogen, Inc.*, 845 F.3d 1168 (Fed. Cir. 2017) and *Consumer Watchdog v. Alumni Research Foundation*, 753 F.3d 1258 (Fed. Cir. 2014)—neither of which applies here, because neither dealt with the harms here.

*Phigenix* dealt with the odd situation where the appellant disclaimed any of the harms at issue here. In particular, the appellant did not "contend that it faces risk of infringing the [challenged] patent, that it is an actual or prospective licensee of the patent, or that it otherwise plans to take any action that would implicate the patent." *See Phigenix*, 845 F.3d at 1173. Instead, the appellant's only alleged harm was a conclusory allegations that the challenged patent inhibited its efforts to license a different patent, without any suggestion that it had tried to license its patent to an entity who also licensed the challenged patent. *Id.* at 1174. Here, by contrast, Altaire

faces a substantial risk of an infringement suit, because it plans to take actions that Paragon would likely consider to be infringement, and the continued existence of the patent imposes reputational harm on Altaire.  Further, unlike the "conclusory statements" offered by the appellant in *Phigenix*, *see id.*, Altaire has provided specific, concrete evidence demonstrating these harms.  *See generally* Ex. 1.

Paragon's reliance on *Consumer Watchdog* is similarly misplaced.  In *Consumer Watchdog*, this Court found that a party who had "only alleged a general grievance concerning" the challenged patent did not have standing to appeal and adverse PTAB decision.  753 F.3d at 1263.  The appellant there could not show any particularized injury because it was "not engaged in any activity that would give rise to a possible infringement suit."  *Id.*  Instead, the appellant primarily argued that the Congress had given it a procedural right to appeal.  *See id.* at 1261–62.  Here, as detailed above, Altaire's interest in the validity of the '623 patent goes far beyond a general grievance.  Altaire has a concrete and individualized injury—both from the threat of an infringement suit and from the harm to its reputation from Paragon's theft of its invention—making *Consumer Watchdog* is inapposite.

## CONCLUSION

As detailed above, Altaire has alleged concrete, imminent, and individualized injury that can be remedied by a favorable ruling from this Court.  Accordingly, Paragon's motion to dismiss this appeal for lack of standing should be denied.

Respectfully submitted,

Date: February 24, 2017

s/ *Craig E. Countryman*

Craig E. Countryman
FISH & RICHARDSON, P.C.
12390 El Camino Real
San Diego, CA 92130
(858) 678-5070

*Counsel for Appellant*
*Altaire Pharmaceuticals, Inc*

## CERTIFICATE OF SERVICE

I certify that counsel for the parties have been served with a true and correct copy of the foregoing document via this Court's CM/ECF system on February 24, 2017.

February 24, 2017

s/ *Craig E. Countryman*
Craig E. Countryman

*Counsel for Appellant*
*Altaire Pharmaceuticals, Inc*

## CERTIFICATE OF COMPLIANCE

I certify that this motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A). The motion contains 5,056 words, excluding the parts of the motion exempted by Fed. R. App. P. 27(d) and Fed. Cir. R. 27(d). This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6).  The motion has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Garamond font.

February 24, 2017

s/ *Craig E. Countryman*
Craig E. Countryman

*Counsel for Appellant*
*Altaire Pharmaceuticals, Inc*